```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
```

| | |
|---|---|
| COMMUNITY BANK OF LAFOURCHE | CIVIL ACTION |
| VERSUS | NO: 11-630 |
| THE M/V MARY ANN VIZIER, IN REM, AND LORI ANN VIZIER, INC., IN PERSONAM | SECTION: "A" (2) |

### ORDER AND REASONS

Before the Court is a **Motion for Summary Judgment Seeking Dismissal of Intervenor's Maritime Lien Claims (Rec. Doc. 32)** filed by Plaintiff Community Bank of Lafourche. Intervenor Kevin Gros Offshore, LLC opposes the motion. The motion, noticed for submission on March 28, 2012, is before the Court on the briefs without oral argument.

### I. BACKGROUND

The M/V MARY ANN VIZIER is owned by Lori Ann Vizier, Inc. On May 8, 2008, Vizier and plaintiff Community Bank entered into a preferred ship mortgage, which was properly recorded. On April 4, 2010, Community Bank put Vizier into default for failing to pay the promissory note secured by the mortgage. On March 22, 2011, Community Bank filed the instant action against Lori Ann Vizier, Inc. in personam and the M/V MARY ANN VIZIER in rem seeking the balance due on the note of $469,170.73, plus accrued interest and attorney's fees. On July 29, 2011, the U.S. Marshal arrested the vessel. Community Bank provided notice of the arrest to all other lien holders of record, and on August 29,

2011, Kevin Gross Offshore, LLC intervened in the lawsuit.  (Rec. Docs. 16 & 17).

Via its complaint in intervention, Kevin Gross Offshore, LLC ("KGO") asserts a maritime lien against the vessel arising out of the alleged breach by Vizier of a Bareboat Charter and Vessel Management Agreement ("the Agreement") (Rec. Doc. 18-1), executed on February 16, 2007, with the vessel being turned over to KGO on that same date.  KGO is seeking the unpaid balance of $300,772.42 plus interest, that is allegedly due under the Agreement.  KGO contends that under the law in this circuit it has a preferred maritime lien that outranks Community Bank's mortgage.  It is unlikely that the proceeds from the sale of the MARY ANN VIZIER will satisfy both Community Bank's and KGO's interests.

Community Bank now moves for summary judgment on the issue of whether KGO has a valid maritime lien against the MARY ANN VIZIER.  According to Plaintiff, KGO does not hold a maritime lien against the vessel because the Agreement that Vizier allegedly breached was not a charter party but rather a vessel management agreement.  Alternatively, if the Agreement was a charter party, then Plaintiff argues that the equitable "joint venture" exception should apply to preclude lien status.

**II.  DISCUSSION**

Under the Ship Mortgage Act, a ship mortgage takes priority over all other claims against a vessel except for preferred maritime liens.  46 U.S.C.A. § 31326(b)(1) (West 2007); Bank One

2

v. MR. DEAN MV, 293 F.3d 830, 832 (5th Cir. 2002). Breach of a charter party gives rise to a maritime lien and that lien will be a preferred maritime lien if it attaches before a ship mortgage is filed. Bank One, 293 F.3d at 832 (citing 46 U.S.C. § 31301(5)(A)). A maritime lien for breach of a charter party attaches when the vessel owner places the vessel at the charterer's disposal even though the breach might have occurred much later in time. Id. at 835. Breach of a non-charter party, maritime contract does not give rise to a maritime lien. Comar Marine Corp. v. Raider Marine Logistics, LLC, No. 09-1438, 2011 WL 2729071, at *3 (W.D. La. July 12, 2011) (Haik, J.).

The Agreement between Vizier and KGO was executed on February 16, 2007, and according to KGO's complaint the vessel was delivered to its custody that very same date. (Rec. Doc. ¶ VI). Community Bank's ship mortgage was recorded on May 9, 2008 (Rec. Doc.1-3, at 7). Therefore, under the clear law of this circuit, if the Agreement is in fact a charter party then its breach will have created a maritime lien in favor of KGO as of February 16, 2007--the date of vessel delivery, not the date of the breach--and KGO's lien will outrank Community Bank's mortgage. If on the other hand the Agreement is a vessel management agreement, and therefore an ordinary maritime contract, then KGO will not have a lien against the vessel based on the breach.

Community Bank argues that when one moves past the

3

Agreement's labeling and invocation of traditional charter party verbiage to delve into its substance, it becomes clear that the Agreement is really a vessel management agreement as opposed to a charter party.  Community Bank points out that under the Agreement, Vizier is responsible for all crew and vessel expenses and costs, as well as a monthly management fee, in addition to the brokerage fee that KGO would earn on each charter that it booked.  Community Bank contends that the jurisprudence regarding bareboat charters is clear in that the vessel owner must relinquish the vessel such that the charterer is responsible for manning it, supplying it, insuring it, etc.  Community Bank argues that the "owner-bears-all-costs" aspect of the Agreement contradicts the assertion that it constitutes a bareboat charter and reveals its true nature as a vessel management agreement.

KGO counters that control is the essential element that courts look to when determining whether a demise or bareboat charter exists and the fact that the contract called for the owner to reimburse operational expenses does not affect the analysis.  KGO points out that payment of expenses cannot be a determining factor in the analysis because under time charters the owner pays all expenses yet breach of a time charter can support a maritime lien.  KGO contends that it is clear under the terms of the Agreement that Vizier retained no control over the vessel whatsoever.

A "charter" is an arrangement whereby one person, the

"charterer," becomes entitled to the use of the whole of a vessel belonging to another, the "owner." Walker v. Braus, 995 F.2d 77, 80 (5th Cir. 1993). There are essentially two types of charters: the voyage or time charter and the bareboat or demise charter. Id.

Under a time charter, the vessel owner retains possession and control of the vessel, and mans, victuals, and supplies the vessel, and is responsible for normal operating expenses. Id. The charterer's use of the vessel is limited to a defined period of time. Id. Under a voyage charter the charterer's use of the vessel is limited to a particular voyage between two defined points. Id. The principal purpose of a time or voyage charter is to move cargo owned by the charterer or to transport people who are employed by or performing work for the charterer. Id. The charterer pays a stated fee for the transportation services involved. Id.

Under a bareboat or demise charter, the full possession and control of the vessel is transferred to the charterer. Id. The stated consideration for a demise charter is payable periodically but without regard to whether the charterer uses the vessel gainfully or not. Id. Under a bareboat or demise charter the vessel is transferred without crew, provisions, fuel or supplies, i.e., "bareboat." Id. When and if the charterer operates the vessel he must supply the essential operating expenses. Id. Because the charterer's personnel operate and man the vessel

during a demise charter, the charterer has liability for any and all casualties resulting from such operation and therefore provides insurance for such liability. Walker, 995 F.2d at 81. A demise charter "requires complete transfer of possession, command, and navigation of the vessel from the owner to the charterer." Id. (quoting Agrico Chem. Co. v. M/V Ben Martin, 664 F.2d 85, 91 (5th Cir. 1981)). "[A] demise is tantamount to, though just short of, an outright transfer of ownership." Id.

The Agreement is by no means a voyage or time charter, and it certainly is not a *traditional* bareboat charter party. The aspects of the Agreement that give rise to any colorable argument of charter party status are that a vessel owned by one party was delivered to a second party who then assumed complete operational control of the vessel and who then became responsible to man, victual, supply, repair, insure, and operate the vessel. The Court agrees with KGO's contention that a contractual agreement to shift expenses is not necessarily fatal to bareboat charter status. Although a traditional bareboat charter shifts responsibility for any costs incurred from the owner to the charterer, see Stolthaven Houston, Inc. v. RACHEL B, No. 08-4327, 2008 WL 2854278, at *4 (S.D.N.Y. July 18, 2008), some authorities recognize that in certain "hybrid charters" some expenses might very well be born by the owner, Charles M. Davis, Maritime Law Deskbook § XII(H) (2010). Further, the lack of contractual provisions for vessel surveys and restrictions on liens,

6

provisions which are *customary* aspects of bareboat charters, does not necessarily deprive a charter party of bareboat status. See United States v. Banda Boats, Inc., 990 F.2d 626, 1993 WL 117821, at *2 (5th Cir. 1993) (unpublished).

This Court is persuaded that the Agreement is exactly what it purports to be--a vessel management agreement *and* a bareboat charter agreement. In other words, the Agreement cannot be categorized exclusively as either a bareboat charter agreement or a vessel management agreement because it is both. To be sure, the Agreement is first and foremost a vessel management agreement. The clear purpose of the Agreement was for KGO to broker charter hires for the vessel so that Vizier and KGO could earn a profit on chartering the vessel to third parties. The parties apparently believed that the most efficacious way to facilitate the brokering arrangement was to deliver the vessel to KGO's facility and give KGO unfettered operational control of the vessel. In admiralty, one places his vessel in the full custody of another via a bareboat charter, and by doing so in this case the parties evinced their intent that Vizier relinquish all control over the vessel, including the ability to arrange hires for the vessel on its own.[1]

---

[1] Further, the fact that the Agreement contractually obligated KGO to use the vessel for a specific purpose does not deprive the charter of bareboat status. See Dow Chem. Co. v. Dixie Carrier, Inc., 330 F. Supp. 1304 (5th Cir. 1971) (demonstrating that a valid bareboat charter can exist even when the owner bareboat charters the vessel to the charterer for the purpose of then time chartering the vessel back to the owner).

But it does not follow that KGO is entitled to a maritime lien for the damages flowing from the breached Agreement just because a valid bareboat charter existed between these parties via the Agreement. Again, the Agreement is first and foremost a vessel management agreement and it happens to include a bareboat charter provision to facilitate the logistics of the service that Vizier hired KGO to perform on Vizier's behalf. Thus, the Court is persuaded that to the extent a maritime lien against the vessel exists for breach of the charter party, that lien does not include any amounts that relate solely to the vessel management aspects of the Agreement, i.e., the $3800 monthly fee that Vizier agreed to pay KGO for its services, the lost brokerage fees, or contractual penalty interest. None of these financial elements of damage relate to the charter party. After all, a vessel owner does not pay a bareboat charterer to take a vessel off of his hands. The Court is certain that KGO cannot avail itself of a maritime lien for the vessel management aspects of its damages claim by piggy-backing those damages on a claim for breach of the bareboat charter.[2]

---

[2] The Court notes that the outcome in this case could be different if Vizier's breach of the bareboat charter provision itself had caused KGO's damages. For instance, if Vizier had decided a month into the contract to reclaim custody of the vessel so that KGO could not operate it and perform under the Agreement. But that is not what occurred here. The Marshal did not arrest the vessel until July 29, 2011, and by that point Vizier had already been in default under the Agreement since February 16, 2007 (Comp. Int. ¶ VII). Thus, by the time the vessel was arrested, the original one year term of the Agreement and bareboat charter had already lapsed.

8

KGO argues that at the very least it should be entitled to a lien for the "necessaries" that it provided to the vessel pursuant to the Agreement--repairs, upkeep, maintenance, insurance, crew wages, and crew supplies.  A person providing necessaries[3] to a vessel on the order of the owner or a person authorized by the owner has a maritime lien on the vessel.  46 U.S.C.A. § 31342(a)(1) (West 2007); 46 U.S.C.A. § 31341(a) (West 2007).

The complaint alleges only that Vizier was contractually obligated to reimburse KGO for certain expenses--not that KGO actually incurred any of those expenses and KGO has produced no evidence of such expenditures thus far.[4]  Moreover, even if KGO, while acting pursuant to its obligations under the vessel management agreement, fronted the cost for certain expenditures that might fall under the definition of "necessaries," it does not necessarily follow that KGO is a party entitled to a maritime lien for those expenditures.

The purpose of providing a maritime lien for the provision of necessaries is to encourage vendors to promptly furnish vessels with supplies and repairs so as to facilitate the

---

[3] "Necessaries" includes repairs, supplies, towage, and the use of a dock or marine railway.  46 U.S.C.A. § 31301(4) (West 2007).

[4] KGO alleges that Vizier breached the Agreement from its inception on February 16, 2007, (Comp. Int. ¶ VII), so it is not clear whether KGO actually performed any of its reciprocal duties under the contract, or if so to what extent.

9

continued operation of vessels in commerce.  <u>Racal Survey USA, Inc. v. M/V MOUNT FLEET</u>, 231 F.3d 183, 187 (5th Cir. 2000); <u>Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV</u>, 199 F.3d 220, 223-24 (5th Cir. 1999).  Reliance upon the credit of the vessel itself, as opposed to the credit of the owner or some other party, is a fundamental concept underlying the maritime lien.  <u>Lake Charles Stevedores</u>, 199 F.3d at 224 n.3 (<u>citing</u> <u>Equilease Corp. v. M/V SAMPSON</u>, 793 F.2d 598, 605 (5th Cir. 1986)).  Under current law the person providing necessaries to a vessel is presumed to have relied on the credit of the vessel.  <u>Racal Survey</u>, 231 F.3d at 188-189; <u>see</u> 46 U.S.C. A. § 31342(a)(3) (West 2007).  The presumption is rebuttable, however, and credit to a vessel remains a prerequisite to a lien so credit to the owner negates the possibility of a lien.  <u>Racal Survey</u>, 231 F.3d at 189 (<u>quoting</u> <u>Equilease</u>, 793 F.2d at 605).

The Court is persuaded that under the particular circumstances of this case, KGO is not entitled to a maritime lien against the MARY ANN VIZIER for the provision of necessaries.  Maritime liens are *stricti juris*, <u>Racal Survey</u>, 231 F.3d at 192 (<u>citing</u> <u>Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.</u>, 254 U.S. 1 (1920)), because they threaten the bargained-for security that other creditors have relied upon.  The law recognizes that ease of obtaining necessaries is so important to the vessel that vendors who supply and service the vessel must be protected when the owner defaults on payment.  But

in keeping with the narrow nature of the maritime lien, a supplier must deal with a person who has authority to bind the vessel, see 46 U.S.C. § 31341, and he must act in good faith, see Lake Charles Stevedores, 199 F.3d at 225 (noting that a supplier who has actual knowledge of a no-lien clause will not be entitled to a maritime lien), in order to obtain a lien.

In this case KGO was not acting as a supplier of necessaries to this vessel because under the clear terms of the Agreement KGO was acting as owner pro hac vice when it incurred the expenses at issue, if any. In other words, KGO was clearly the entity with authority under 46 U.S.C. § 31341 to bind the vessel but KGO was dealing with itself in the capacity as both owner and supplier of the services. This occurred because KGO was not acting as a third-party supplier of services to the vessel but as a party who had contracted with Vizier to manage and operate the vessel at a profit to both parties under the terms of the Agreement. Allowing KGO to claim a maritime lien on the vessel for its deal gone bad with Vizier would be contrary to the purpose of allowing bona fide suppliers the protection of a maritime lien. This is exactly what the Fifth Circuit demonstrated in Sasportes v. M/V SOL DE COPACABANA, when it recognized that parties such as owners, part owners, and joint venturers--parties who are not "strangers" to the vessel--cannot hold a maritime lien against the vessel for equitable reasons. 581 F.2d 1204, 1207 (5th Cir. 1978).

Moreover, a lien cannot exist where the supplier does not rely on the credit of the vessel itself. Although an ordinary arms-length supplier would be entitled to the presumption that it relied on the credit of the vessel, it is not so clear that such a presumption applies under these facts. Moreover, the express terms of the Agreement itself belie any such presumption because the Agreement leaves little doubt that KGO was relying on the credit of the owner (Vizier) when it agreed to front the costs for the vessel's expenses. And if KGO had been relying on the vessel's credit when incurring expenses then it would seem logical that KGO would have taken steps to attempt to enforce its purported maritime lien sooner given that Vizier had defaulted on the Agreement almost immediately. Instead, KGO made no attempt to obtain payment from the vessel itself until over four years after Vizier had first breached the Agreement, and after Community Bank had foreclosed on its ship mortgage and incurred the expense of having the vessel arrested.

In sum, KGO does not have a valid maritime lien against the MARY ANN VIZIER and its intervention complaint is therefore dismissed.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment Seeking Dismissal of Intervenor's Maritime Lien Claims (Rec. Doc. 32)** filed by Plaintiff Community Bank of Lafourche is **GRANTED**. Intervenor Kevin Gros Offshore, LLC does not hold a maritime lien

12

against the vessel M/V MARY ANN VIZIER and its complaint in intervention is **DISMISSED**.

May 11, 2012

```
                                    _____
                                          JAY C. ZAINEY
                                   UNITED STATES DISTRICT JUDGE
```